**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

**JOHN DAVIS,**

     **Plaintiff,**

    **v.**                     **Case No. 1:23-cv-1017**

**KELLER WILLIAMS REALTY, INC,**
**GARY KELLER, JOSH TEAM,**
**BUSINESS MAPS, LTD., and**
**BUSINESS MAPS MANAGEMENT, LLC,**

     **Defendants.**

---

### COMPLAINT AND JURY DEMAND

---

Plaintiff John Davis ("**Davis**" or "**Plaintiff**") complains of Defendants Keller Williams Realty, Inc. ("**KWRI**" or "**Keller Williams**"), Gary Keller ("**Keller**"), Josh Team ("**Team**"), and Business MAPS, Ltd. and Business MAPS Management, LLC (together, "**MAPS**") (hereinafter collectively referred to as "**Defendants**") as follows:

### THE NATURE OF THE ACTION

1.     Gary Keller owns Keller Williams, MAPS, and a slew of related or affiliated privately owned entities that are entangled in and eating from Keller Williams' web.  According to Keller, "**because we're private, we're not under a microscope.  We can do what we want, any way we want with no penalty**." (Keller email to Plaintiff dated October 10, 2018).

2.     This action arises out of the fraudulent, illegal business scheme of Keller Williams, the world's largest real estate franchise by agent count, with more than 1,100 offices and 191,000

1

agents,[1] and its web of affiliated entities and individuals who control, operate, and directly benefit from the KWRI business model and franchise system.

3.     Through this illegal and criminal-minded scheme, the Defendants sought to and indeed did fraudulently induce individuals, including Plaintiff, to invest substantial amounts of money and time and purchase Keller Williams Regions and Market Centers through false and changing representations according to their playbook, and thereafter, exploited their control and economic power in order to extract exorbitant payments from the owners of these independently owned and operated Regions and Market Centers.  As a result, Defendants derive grossly inflated sales and profits, creating an illusion of corporate growth and business prosperity while causing substantial, permanent, irreparable financial harm to the owners of independently owned and operated Regions and Market Centers.

4.     Defendants' scheme consists of three primary components.  First, Defendants engage in a pattern of fraudulently inducing individuals, including unsuspecting investors and first-time business owners, to purchase KWRI Regions and Market Centers by knowingly, willfully, and intentionally misrepresenting the true nature of the contractual relationship, the financial prospects and likelihood of success and long-term stability for the independently owned and operated Regions and Market Centers.

5.     Defendants further take advantage of the owners of independently owned and operated Market Centers by demanding that Market Centers lower their agent cap, going directly against their own franchise agreements which state that Market Center owners set their own cap

---

[1] Keller Williams is also number one in units and sales volume in the United States. *See Keller Williams Dominates RealTrends 500*, Keller Williams (Mar. 24, 2023), available at https://headquarters.kw.com/press/keller-williams-dominates-realtrends-500/#:~:text=Austin%2C%20Texas%2Dbased%20Keller%20Williams,volume%20in%20the%20United%20States.

at the time the licensing agreement is signed, thereby instantaneously and completely devaluing the independently owned and operated Market Centers, and taking hostile action against and effectively ostracize or affix a scarlet letter on any Market Center owners who refuse to comply with Defendants' scheme.  Indeed, Keller, the godfather of the syndicate, has stated that he would "financially destroy" those that did not comply.

6.      Second, Defendants exploit the overwhelming economic power that their syndicate holds over Region and Market Center owners by creating a captive artificial consumer market, comprised of all of its Market Centers, for products and services that KWRI requires to begin and continue the operation of a KWRI Market Center.

7.      While concealing the full nature of its own relationships with "suppliers" of these services from potential owners, KWRI uses its exclusive control over the Market Center system to, among other things, funnel hundreds of millions of dollars to Keller, individually or through Keller owned and controlled companies other than KWRI, by forcing Market Center owners to: (a) purchase unneeded goods and services from KWRI owned and/or affiliated companies, which are owned by Keller; (b) purchase and/or over purchase unnecessary, obligatory "coaching" from MAPS, which is also conveniently owned and operated by Keller; (c) employ coaches to train Market Center employees/independent contractors using MAPS techniques, or suffer backlash or even potential non-renewal of Market Center agreements if they failed to comply or pay the required fees; (d) buy books written by or for Gary Keller for Keller's own personal enrichment and self-serving needs; and (e) pay an ever-increasing "technology fee" that would make Microsoft envious, for unoriginal and buggy software, and, on information and belief, an improper allocation of funds for purposes outside of the defined and accepted terms of the franchising agreements.

8.      <u>Third</u>, once the franchises are devalued and/or after Defendants successfully cause a franchise owner to be unjustly ostracized from the investor group, and the owner has no choice but to sell the entity or face financial hardship and/or bankruptcy, Defendants improperly interfere with the sale of independently owned and operated Regions and Market Centers, refuse to allow sales at market price to qualified individuals, and instead dictate that sales be made at extremely depreciated prices to Keller himself and/or others within the KWRI enterprise. Indeed, Defendants' playbook, as stated by Keller himself, is "why buy what we can steal."

9.      Defendants' conduct inherently raises a conflict of interest that routinely results in KWRI and the individual defendants choosing their own interests over those of its own franchisees within the KWRI franchise system. Further, Keller and KWRI consistently engage in conduct wherein they seek to target, punish, and destroy those that attempt to go against Keller. Defendants' pyramid scheme-type playbook pits franchisees against each other in a divide and conquer manner, where only Keller comes out on top or wins.

10.      The fraudulent intent underlying Defendants' scheme includes, among other things, (a) deceptively inducing individuals to purchase, build up, and continuing to throw money into their so-called independently owned and operated Regions and Market Centers, (b) extracting exorbitant fees from the franchisees, thereby devaluing the franchise of profit while funneling money to Keller-owned entities, and (c) demanding that franchises or investor interests therein be sold back to KWRI-affiliated individuals at a below-market price.

11.      The scheme is demonstrated by a pattern of behavior when the inevitable financial losses of both Regions and Market Center owners come to pass.  Through this scheme, KWRI itself and the other Defendants suffer no loss, and only gains, from the harm caused to the individual owners. In total, Defendants' scheme has caused franchisees to lose hundreds of

millions of dollars in total. Unless stopped, Defendants will continue to subject franchisees to the same scheme for the purposes of substantial interest and profit.

12.     Over the years, KWRI has called itself many different things:  first, KWRI called itself a "Profit Share company."  Then, KWRI called itself a "training and coaching company masquerading as a real estate company."  Later, KWRI declared itself a "technology company." No matter what KWRI attempts to label itself, at the end of the day, KWRI is a franchise company, and KWRI's scheme runs afoul of franchise ethics and puts the franchisees, who are main components funding these different aspects of KWRI, at a disadvantage from the start.

13.     As a franchise company, KWRI has achieved growth, wealth and fame, which has led to Keller's personal financial freedom.  Indeed, due to KWRI's Royalties and technology fees, Keller's income has more than doubled.  All the franchisees have gotten, however, are lies, deception, and severe depreciation in value of their investment, with Owner Profit down nearly 50% since Keller took over control of KWRI after Plaintiff's departure as CEO.

14.     Despite Keller's assertions, and due to Defendants' illegal conduct, Plaintiff brings this action alleging violations of the Racketeer Influenced and Corrupt Organization ("**RICO**") Act, 18 U.S.C. § 1962, violation of § 1 of the Sherman Act, as well as state law violations of fraud in the inducement and breach of contract.

## THE PARTIES

15.     John Davis is a natural person and a resident of Colorado.

16.     Keller Williams Realty, Inc. is a Texas for-profit corporation with its principal place of business located in Travis County, Texas, and may be served through its registered agent, Valerie Volger-Stipe, at 1221 South Mopac Expressway, Suite 400, Austin, Texas 78746, or wherever she may be found.

17.     Gary Keller is a natural person residing in Travis County, Texas, and may be served with process at his residence located at 105 Riley Drive, Austin, Texas 78746, or wherever he may be found.

18.     Josh Team is a natural person residing in Tarrant County, Texas, and may be served at 3309 Alexandria Ct., Southlake, Texas 76092, or wherever he may be found.

19.     Business MAPS, Ltd. is a Texas limited partnership with its principal place of business located in Travis County, Texas, and may be served through its registered agent, Valerie Volger-Stipe, at 1221 South Mopac Expressway, Suite 400, Austin, Texas 78746, or wherever she may be found.

20.     Business MAPS Management, LLC, which is the General Partner of Business MAPS, Ltd., is a Texas limited liability company with its principal place of business located in Travis County, Texas, and may be served through its registered agent, Valerie Volger-Stipe, at 1221 South Mopac Expressway, Suite 400, Austin, Texas 78746, or wherever she may be found.

## JURISDICTION AND VENUE

21.     This Court has federal question and diversity jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332 because (i) the federal law claims arise under the constitution and statutes of the United States; and (ii) Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

22.     This Court has personal jurisdiction over Defendants because they reside or are incorporated in, and conduct business in, the State of Texas.

23.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

I.   **KWRI BACKGROUND AND STRUCTURE**

24.   KWRI was founded by Defendant Gary Keller and co-founder Joe Williams in 1983 as a single real estate office located in Austin, Texas.

25.   Throughout the 1980s and 1990s, Keller Williams was a small regional residential real estate company based in Austin, Texas, that began franchising local market centers. It moved along in fits and starts but could not develop consistent patterns and practices for growth.

26.   Originally, KWRI operated as a traditional split model for its agents (for example: 50/50 or 60/40).

27.   Eventually, however, KWRI, in an effort to compete with and recruit real estate agents from other real estate companies, moved to a "cap" system, wherein the fees paid by agents are capped annually, and once the set cap is met, the agent receives 100% of the commission earned per transaction.

28.   Under the cap system, the Market Center collects a portion of the commission until the agent caps, which goes towards the agent's Market Center cap, and contributes to the independently owned and operated Market Center's individual profit as well as the robustness of the office, including products, support and services provided by the Market Center for the success of the agents.

29.   The amount of the cap for any particular Market Center depends largely on the conditions of the market in which it is located.  For example, setting a single cap for different markets would severely harm the profitability of Market Centers located in higher cost markets, and this has been seen to be true.

30.     Indeed, a franchisor attempting to set a universal cap by looking at national market conditions is akin to determining a local city's temperature by looking at the nation's average temperature.  Therefore, a Market Center cap is highly individualized to each particular Market Center and, until 2019, was set by the individual Market Center when the licensing agreement was signed.  The Market Center cap then could only be changed by the Market Center owner in response to factors in their local business environment.

31.     In addition to the Market Center cap, the Market Center also collects a universal Royalty fee per transaction, which is wired from the Market Center directly to KWRI as part of a monthly transmittal. Royalty is collected per transaction and is capped at $3,000.

32.     This cap system enabled KWRI to recruit top earning agents throughout the country and led to the success of KWRI as one of the fastest growing real estate companies nationwide.

33.     As KWRI expanded, it quickly shifted from one single office to a thriving franchise system, comprised of KWRI and KWRI Regions and Market Centers, which are independently owned and operated.

34.     Keller Williams is the head of the franchise system, which was founded, owned, and controlled by Defendant Keller.  Keller also serves as the Chairman of the Board, has served as CEO, and is currently the de-facto CEO.  As a franchisor, Keller is bound by franchise law and ethics, which he routinely circumvents in an effort to increase his own control and bottom line.[2]

35.     There are still a few independent Regions that Keller has not bought back yet; however, Keller, members of his Board, and his associates own and control the majority of the

---

[2] Franchisees purchase the right to use the KWRI operating system that was presented to them when they joined the system. While there may be leadership changes, due to the number of different individuals involved in a franchise system, a responsible franchisor will minimize changes to the operating system, and communicate changes clearly and ahead of implementation. Franchises thrive in stability. On information and belief, Keller often threw franchisees into disarray in bad faith by not clearly communicating changes in the system in an effort to destabilize and devalue the individual franchises.

approximately 32 Regions, making the Keller Williams Regions an extension of Defendant Keller's personal empire, rather than a functioning franchise system.

36.     This control of the Regions allows Keller to leave the franchisor's boundaries behind with the net effect being he is like an employer to the independently owned and operated Regions and their Market Centers, and they must comply with his threats or have the actual owners of these so-called independent Regions and Market Centers removed from their leadership positions.  Their reason for removal being simply disagreeing with Keller.

37.     KWRI also franchises hundreds of Market Centers[3], which are overseen by their corresponding Regions.  While Keller does not own interests in the individual Market Center franchises, he nonetheless exerts full control over each Market Center through constant directives and mandates, and, if such directives are not followed, threats to have owners removed from the independently owned and operated Market Center and/or Region.

38.     Indeed, on information and belief, Keller and his associates have sent numerous letters of non-renewal to independent owners and operators refusing to renew their license as a result of supposed "non-compliance" when a franchisee refused to cooperate with a Keller mandate.  Further, when an owner refuses to comply, Keller initiates a full-fledged smear campaign against that individual within the investment group of the Region or Market Center to create an environment which is so hostile as to constitute a constructive ousting from the KWRI system as a whole.

39.     KWRI has remained a private company throughout the entirety of its existence, and has adopted a strategy of rapid growth of its touted franchise system, while also imploring strategies of increasing KWRI's own bottom line by forcing franchisees to pay for products and

---

[3] To date, there are more than 1,100 Market Centers throughout the United States and Canada.

services, at inflated prices, from companies also founded and owned by Keller.  While not presented as "required" when purchasing a Market Center or Region, Keller and KWRI push out and ostracize Regional or Market Center owners and who refuse to purchase these products.

40.     These measures have been adopted, on information and belief, to increase Keller and KWRI's profit, inflate KWRI's supposed profitability, and therefore make it more attractive to potential Market Center and/or Regional owners and investors, toward the ultimate goal of having others build up the franchises, only to have Keller or his partners to repurchase the entities at a deflated price and therefore retain complete control over the entire KWRI franchise model.

41.     Additionally, Keller Williams has not only touted itself as a real estate company, but also as a technology company.  In doing so, Keller Williams has forced independently owned and operated Regions and Market Centers to use the technology, whether effective or not.

42.     To effectuate the notion that Keller Williams is a "technology" company, Keller Williams further forces independently owned and operated Market Center owners and their agents to pay an ever-increasing technology fee, on top of an armada of other fees every month.  In the past six months, the mandated monthly technology fee has more than doubled, going from $25 per agent to $51 per agent, resulting in approximately $56 million per year gain on the increase alone. On information and belief, KWRI has plans to increase the fee to $100 per agent per month.[4] However, on information and belief, Keller has done nothing but pocket the increased technology fee for quite some time.

43.     Keller, who is not particularly astute to technology, partnered with Team regarding "technology" at KWRI.  Team, on information and belief, wanted to get on Keller's good graces,

---

[4] On information and belief, Keller has stated that he personally funds KWRI's technology, despite massive technology fees being collected from franchisors. This only demonstrates further that Keller, on information and belief, believes that KWRI's money is his personal money.

and made large promises to Keller as to new kinds of technology that could be delivered.  Keller, however, never thoroughly inspected Team's work.

44.     Keller gave Team a fortune to produce technology, which Team irresponsibly and selfishly squandered.  Indeed, when Keller and Team's work was "completed," and after Team's departure from KWRI, his ruse was discovered as two individuals from KWRI themselves said that there was no possible way to make the technology useful or of any sort of value.

45.     Keller and Team therefore saw hundreds of millions of dollars go towards technology that could not be used.  However, they *also* saw hundreds of millions of dollars in technology fees collected from franchisees, which, if not put towards technology, could be individual profit for Keller.

46.     On information and belief, when Team's technology failed, KWRI continued to collect, and even increase, the technology fee to independently owned and operated Market Centers, and instead of putting that money towards new technology, Keller pocketed the fee for himself.

47.     Keller and Team implemented notions of KWRI being a technology company to justify increased investment dollars by Market Center owners, and to extract exorbitant technology fees from independently owned and operated Market Center owners, cutting into their hard-earned profit. The technology fee is also a source of contention between independently owned and operated Market Centers and some of their agents, as the agents felt "why should they pay the fee, when the technology was an embarrassment to some of their businesses." The independently owned and operated Market Centers had to spend their political capital to retain agents and clean up Keller and Team's mess, because the technology did not work.

48.     For years, KWRI has continued and even enhanced its deceptive and fraudulent practices with respect to its franchisees, which allow it to extract hundreds of millions of dollars from franchisees while simultaneously making it incredibly difficult, *if not impossible*, to operate profitably.

## II.     PLAINTIFF DAVIS'S RISE TO SUCCESS AT KWRI

49.     Defendant Keller previously hired a CEO to grow the business by increasing agent count. This CEO was rewarded with a 10 percent stake of Keller Williams for increasing the agent count to a new higher level.

50.     However, it wasn't until after the 2008-2009 economic recession that Keller Williams' true growth and statute in the real estate business grew under the Growth Initiative led by plaintiff John Davis.

51.     Davis's efforts to systematically grow Keller Williams focused on continually recruiting more agents by focusing on the market-based cap system at Keller Williams, which capped agent commissions to Keller Williams based on local market economics.

52.     This system was popular with agents, market center owners, regional market center owners and KWRI because everyone benefitted financially from this arrangement

53.     In fact, from 2011-2018 Keller Williams was the darling of the real estate industry with high continual growth and accolades from throughout the industry was recognized with its first-ever 'triple crown' in real estate (most listings, highest volume, highest agent count) in 2017.

54.     Before becoming KWRI's CEO in 2017, Davis spent decades working in nearly every aspect of the business: Loan Officer, Agent, Team Leader, Market Center investor, Operating Partner, Regional Director, Regional Operating Partner, Vice President, and President. That experience gave Davis a unique perspective and deep, abiding respect for every type of

business in a franchise company. Plaintiff began his career in the real estate industry in 1996, at the age of 28 as a Loan Officer with Advantage Mortgage, a company owned by Keller. Davis then became a real estate agent for KWRI. Later, Davis became a Team Leader, taking a struggling Market Center with a mountain of debt to the third most profitable Market Center in the Keller Williams system. Davis was also named to the KWRI Team Leader Hall of Fame, and, in 2011, was named Entrepreneur of the Year.

55.     Davis also became a well-respected operator and investor of multiple KWRI Market Centers and Regions throughout the country.

56.     In 2011, Davis was named Vice President of KWRI, where he pioneered KWRI's Growth Initiative, which focused on helping independent franchisees grow within the industry while creating a healthy, profitable real estate ecosystem that benefitted all parties.

57.     As President and CEO of KWRI, Davis implemented strategies that protected Market Centers' businesses, while also respecting that they were individually owned and operated. Davis empowered businesses with the greatest possible advantages for support, service, market share, and growth opportunities. Davis did not want agents to be dependent on Keller Williams. Instead, he wanted to teach them to grow their businesses interdependently. Davis's strategy was highly successful in accomplishing just that, as Market Center and Region profitability soared under Davis's direction, and agent sales units were at their highest in the history of the company as well.

58.     It was due to this growth strategy and Davis's strong leadership that KWRI became the fastest growing real estate franchise in the world. Indeed, under Davis's leadership, from 2011-2018 the number of real estate agents employed by KWRI more than doubled to approximately 187,000 agents.

59. Davis led company-wide growth from 2011 to 2018. Under Davis's partnership with the individually owned and operated Market Centers and Regions the agent count almost tripled. It was a partnership that created a win-win-win. This agent growth, which led to record setting consistent profit that has not been seen before or since, attracted 145 Market Centers.

60. The growth of independent Market Centers under Davis's leadership allowed the owners of these Market Centers to reap record high owner profit. These leadership decisions at the independently owned and operated local level created highly productive environments in which agents were empowered to set, track, and achieve huge goals. Profit Share for the agents exploded.

61. In turn, KWRI's Royalty was also at an all-time high. Under Davis's leadership, the system worked for everybody. Defendant Keller appointed Davis to President in 2015, Co-CEO in 2016, and sole CEO in 2017.

62. Keller and KWRI may claim that the market is currently driving down profitability across the board, however, the KW model is actually built for different markets. An examination of the activities will show that it is Keller's leadership driving down profitability, not the market. Davis knows this personally because the Growth Initiative was actually launched during the worst economic downturn since the Great Depression and Davis led businesses to grow.

63. The independently owned and operated Market Centers' growth became a standout in the industry. The industry recognized this success and named Davis to numerous third-party lists of top executives across all industries. Most importantly, Keller Williams associates named Davis the number 30 CEO across all industries by Glassdoor in 2018 with unsolicited reviews. The incredible growth of the independently owned and operated Market Centers by agent count, agent productivity, and profitability made Keller Williams a top workplace.

64.     In 2018, the success of independently owned and operated Market Center operators working alongside Davis, not for Davis, led to Davis being named the seventh Most Influential Person in Real Estate. Davis did not speak much about this, however, because Davis knew it was about the people, not him.

65.     In summation, Davis's leadership led to a thriving and productive workplace environment at Keller Williams, which led to financial growth and opportunities for all in the entire Keller Williams ecosystem. Inevitably, however, this growth led to more money for the founders of KWRI, namely, Defendant Keller. With hold of more money, greed took a hold of Keller shortly thereafter, and what once was a top, sought-after workplace turned into what can only be likened to a criminal enterprise that Davis could not stand for.

66.     Despite the universal success of Keller Williams agents, market centers, and regions during this period, defendant Keller devised an illicit scheme to tilt proceeds back upstream to himself, his co-defendants and hand-chosen favorites that would erode the value of market center ownership.

67.     Although KWRI and Keller reaped huge financial rewards from Davis's Growth Initiative, strategies, and leadership, among other things, Keller did not want Market Center owners to share the newfound wealth—instead, Keller wanted this wealth for his own. Keller's leadership is intentionally driving down profitability, and not the state of the market.

68.     Defendant Keller declared "market centers have no value" and brought in a host of other named defendants to work to consistently diminish and undervalue market centers and prove that once-profitable locally owned and operated market centers would have no value, depriving market center owners of the investments and holdings. Keller devalued other's property and hard-earned businesses for his own gain and the gain of his co-defendants.

69.     Indeed, when Keller noticed just *how much* money he could make by retaining control of the franchise branches, even by improper or otherwise illegal means, the KWRI motto has changed from "where entrepreneurs thrive," to Defendant Keller and Team's new personal motto of "why buy what you can steal."

### III.    BECAUSE OF KELLER'S GREED, KWRI WENT FROM WIN-WIN-WIN UNDER DAVIS, TO LOSE-LOSE-WIN AFTER DAVIS RESIGNED AS CEO

70.     After Davis resigned a CEO of KWRI, Keller stepped in and devised a plan to control and take back profit from the independent Market Centers.

71.     Ever since Keller's greed took hold of him, he and Defendant Team have combined to create an enterprise which houses three main cyclical components: (1) induce franchisees to purchase Market Centers and/or Regions in order to build up the new business; (2) devalue the franchise by means of charging unnecessary fees and slashing owner profits; (3) when the business is facing financial hardship due to KWRI undermining control of the Market Center or Region, and the owner has no choice but to sell, refuse to approve the sale to an independent third-party, and instead demand that the sale be made to Keller and/or his associates at a price much lower than fair market value.

72.     KWRI undermines independently owned and operated Market Centers by tortiously interfering with independently owned and operated investment groups, intentionally creating chaos to pit the independently owned and operated Market Centers against each other and forcing out Market Center leadership in bad faith for improper purposes, so that in their weakened state, Keller and his associates can demand that a sale be made to them at a price that is criminally low.

73.     Defendants' "why buy what you can steal" scheme affects and destroys the livelihood of those that entered the KWRI system in the hopes of becoming a successful,

independent entrepreneur, and instead is akin to a pyramid scheme where the only one that benefits is the person at the top: Gary Keller/KWRI.

74.     It is through this scheme that Defendants maintain control and ownership over the entire franchise system and saddle the owners of independently owned and operated Market Centers with debt against their will, so that the owners have no choice but to either sell back to Keller and his associates or keep paying Keller his mandated fees in order to avoid legal consequences.

75.     In order to effectuate this scheme, Keller thought up a plan which would increase his and KWRI's bottom line, but drastically cut franchisee profits: lower the Market Center cap[5], charge Market Centers an increasing technology fee, and force franchisees to purchase goods from Keller-owned businesses, such as MAPS coaching in order to take back the growth and profits of Market Centers realized under Davis's tenure.

---

[5] The insistence by Keller to lower Market Center cap was not for the benefit of any individual franchise, but instead, was largely driven by his paranoia of a new company, eXp, which had lower caps than KWRI, taking KWRI's place in the industry. On information and belief, Keller was also jealous that eXp was getting attention as an innovative model, which Keller felt took away from his luster as a real estate "genius." Keller was fixated on eXp and could not stop talking about it. His paranoia was so great that when a top producer from KWRI left to go to eXp, Keller overgeneralized it as a movement and spoke about it constantly. Davis would tell Keller that the reason why a "Pirate", who was one of Keller's special group of elite agents, was lost to eXp was because of Keller's relationship with the top producer, but also Keller's fear of eXp generated curiosity in the top producer. On information and belief, their thinking was that if Keller was so afraid of it, it had to be good. Keller was essentially the best recruiter for eXp, though Keller would say it was the ineptitude of the independently owned and operated Market Centers that caused the loss. Defendant Keller was essentially hosting an eXp seminar when he would talk with his "Pirate" group. These sessions were otherwise focused on anything under the sun to help their businesses from masterminds on how to build teams to Keller personally doing seminars on how to keep commissions. Keller personally led seminars on how to set and keep real estate commissions.

Notably, this paranoia over eXp was not even driven by real market concerns, but was, on information and belief, due to the fact that the individual that founded eXp was a former KWRI "Pirate" who had resigned. Further, eXp is not a franchise system, but rather is a single brokerage. Thus, eXp and KWRI cannot feasibly operate in the same manner. Unlike eXp, KWRI's Market Center cap belongs to the Market Center. As a brokerage, eXp could set caps for all of their offices. In other words: Keller was willing to lie to and sacrifice all of his franchisees to save himself and take down one person—the individual who dared leave Keller Williams. Indeed, when Keller feels that he has been slighted in any magnitude, whether it is someone wanting to work with someone other than Keller or someone leaving his company and having success, Keller, on information and belief, seeks to target and destroy that person at all costs, even if it would hurt his own people.

76.     Indeed, dating back to 2017, Keller began emailing and speaking with Davis insisting that market caps be lowered by the independently owned and operated Market Centers in order to "recruit agents."

77.     From understanding the economics of the Market Center, Davis was most worried that cutting the cap would diminish Market Centers' ability to provide the quality support that agents deserved. Davis believed agents deserved support in capping as quickly as possible so that their income was unlimited. This created a win-win-win. The system worked.

78.     However, directing reduced caps created a lose-lose-win. A loss for the Market Center, a loss for the agent, and a win for Defendant Keller, because KWRI's Royalty did not change. On the other hand, Keller directing reduced caps to businesses that were not his own, that he did not operate, created a lose-lose-win: a loss for the Region, a loss for the Market Center, a loss for agents (though they might initially appreciate a lesser cap, they will get exponentially less in being denied the support and services they deserved to achieve their greatest success), and a win for Gary Keller.

79.     For years, Davis resisted Keller's insistence on lowering Market Center caps. Among other things, Davis believed it was an infringement on the rights of Market Center owners because, until that point, independently owned and operated Market Center owners had been permitted to set their own individual caps in light of the individual market, taking numerous factors into account.

80.     Davis believed in respecting the owners' ownership and operation. Davis was concerned that circumventing the licensing agreement and mandating a universal cap would violate franchise law and KWRI's role as a franchisor, crossing the line into becoming a de facto broker. Keller wanted to operate KW as a sole broker, not a franchise.

81.     Gary Keller himself, Chairman of the Board, when he had the coveted Triple Crown in real estate (number one in agents, number one in sales units, number one in sales volume) believed and stated that franchising was dead.

82.     Indeed, determining a Market Center cap requires a careful business analysis that incorporates the needs and expectations of individual markets and in the independently owned and operated Market Center, a consideration of current and future expenses as related to agent leadership, space, service, and support, and a realistic analysis of recruiting capabilities and attrition rates.

83.     To simplify, if a Market Center owner decides to reduce their cap by half, they have just reduced their income by half. They would need to then recruit double the number of productive agents to continue at the same level of profitability. If they do not recruit the number of productive agents they need, at the pace they need, they may need to reduce the leadership, space, service, and/or support they provide to agents.

84.     This may further impair their ability to recruit productive agents at the pace they need. This equation is further complicated by the fact that if they are competing on cost, they are recruiting agents whose main concern is cost, not production. These agents may not be interested in building businesses and therefore may only pay a portion of the cap (if any) per year. Clearly this was not a win for the independently owned and operated Market Centers as the numbers have borne out.

85.     Further, nothing in the individual franchise agreements gave Keller or KWRI the power to set market caps themselves for the independently owned and operated Market Centers. Indeed, in recommending specific and universal Market Center cap amounts, Keller was overstepping the franchisee's role in leading an independently owned and operated Market Center.

86.     Davis tried to push back on Keller's idea because the strategy would not only hurt Market Centers, but Davis believed it would not set the right example, as an investor in multiple Market Centers and Regions. If Davis had gone along with Keller's strategy, Davis believed that it would harm operators and diminish their futures, as well as harm agents immediately and long-term.

87.     Despite Davis's resistance, Keller demanded that universal caps be recommended. Due to this conflict in morals and strategy, Davis felt he had no option but to voluntarily resign from his position as CEO in January 2019.

88.     Davis hoped that his resignation would send off a warning flare about the consequences of cutting caps in half and ignoring the independent nature of the Market Centers and Regions. Davis further hoped that his resignation would cause Keller to rethink his strategies and put all businesses, including agents, investors, and operators of independently owned and operated franchises first.

89.     Unfortunately, however, after Davis's resignation, Keller's behavior and scheme only worsened. Davis, as an individual who helped build KWRI into the empire that it is today, and who deeply cared about each and every one of the independently owned and operated franchises and each of the agents in those offices, was deeply hurt to watch Keller's ruthless, deceptive practices take hold.

90.     Once Davis resigned, Keller began a full-fledged campaign to devalue Davis's investments and take him down in the industry. On information and belief, in Keller's eyes, no one leaves KWRI voluntarily without punishment and being smeared. Indeed, Keller employed an active campaign to disparage Davis. For example, shortly after Davis left, Keller insisted that the

entire KWRI system was "broken," thereby implying that Davis broke the system, and that Keller was the hero coming to save the day. However, this could not have been further from the truth.

91.     Moreover, in ongoing efforts to devalue the franchised business holdings of others, defendant Keller, his co-defendants, and hand-picked favorites further engaged in the illicit scheme after Market Centers were coerced into lowering their caps.

92.      Lowering caps created a profit crisis in Market Centers whereby profits dropped an average of 50 percent; indeed, upon information and belief, current market center profit margins hover around 1 percent.

93.     A Market Center's lack of profitability can actually put a Region into default and become a major franchise agreement compliance issue. By putting a Market Center into default, it can trigger a potential upstream default for the region it resides in within Keller Williams.

94.     Defendant Keller, his co-defendants and Keller Williams Legal Department have further eroded the structure of independently owned and operated Market Centers by unilaterally implementing rolling one-year agreements based on goals set not by the independently owned and operated market center but instead by defendant Keller and his co-conspirators.

95.     Furthermore, Regional operating partners have also been given unilateral, specific goals set by Keller Williams and its legal department and are instructed to sign new agreements. Market Center and Region agreements have become rolling one-year agreements rather than the ten-year agreements stipulated in the franchise agreement. Market Center owners that are unable to meet the unilaterally set goals face default in their agreements rendering their holdings worthless and bringing to fruition Keller's belief that market centers have no value. The threat of default to Market Center or Region renders the holdings worthless and subject to takeover by Keller in the ethos of 'why pay for something you can steal.'

96.     Defendant Keller has constructed a means by which to generate performance and profit issues for Market Centers. These goals include profitability metrics impossible to meet through the defendants' insistence on lowering caps and the continually increasing costs for Keller William's worthless software and overpriced training materials. By weakening Market Centers financially that in turn creates more compliance issues for a region. A Region that has significant Market Center compliance issues can be placed in default.

## IV.   DEFENDANTS' FRAUDULENT MISREPRESENTATIONS TO REGIONAL AND MARKET CENTER OWNERS

97.     At the same time that KWRI solicits franchisees to enter into unconscionable franchise agreements, it engages in a practice whereby it extracts substantial fees and payments from franchisees, in exchange for the ability to operate a franchise that KWRI: (i) knows, or should reasonably know, will likely fail to be profitable; and (ii) intends to maintain control of, and buy back at a deflated price, thereby retaining control of the entire franchise system.

98.     On information and belief, when speaking to potential franchise owners, KWRI did not report the likelihood of business failure, underreported the number of failing Market Centers and/or Market Centers in existing default under the licensing agreement, and further did not disclose that KWRI and Keller would habitually interfere with the sale of independently owned and operated Market Centers in an effort to further devalue the businesses and purchase back the franchises at a deflated price. KWRI intentionally failed to disclose these truths to prospective franchisees to conceal and prevent prospective franchisees from obtaining information that would enlighten them to the true risks involved in owning or operating a KWRI franchise, the very likely potential for partial or complete loss of capital invested in the franchise system, and the lack of real opportunity to be a successful and profitable independently owned and operated business owner.

99.     KWRI also concealed that that KWRI and Keller had plans to manipulate the cap system since 2017—the very system which once gave franchisees the ability to run their independently owned and operated business freely according to the location and market.

100.    In early 2019, Keller recommend that Market Center owners reduce their caps in order to recruit top agents and in turn increase profitability. Increased profitability, however, was a false premise.

101.    While this cap reduction was not "mandatory" by its terms, those who refused were ostracized and pushed out of their leadership positions and possibly their ownership positions within the KWRI system.

102.    On information and belief, Keller knew that by reducing Market Center caps, independently owned and operated Market Centers would lose profitability, and therefore those independently owned and operated Market Centers would lose value. Indeed, on information and belief, Keller even agreed to cover some of his chosen franchisees' losses if they agreed to reduce their caps, in the hopes that others would file suit. Of course, Keller and KWRI did not disclose that to the hundreds of unknowing Market Centers. Keller sent Regional Representatives ("Regional Directors") to individually owned and operated Market Centers in an effort to deceive those Market Center owners under the guise that it would increase growth and profit.

103.    On information and belief, Keller misrepresented the negative impact that reducing caps would have on Market Centers by purchasing a number of Market Centers, changing the caps, and hiding that the Market Centers were not making money in order to demonstrate proof of concept.

104.    In order to convince Market Centers to lower their caps, Keller stated in emails to franchisees that in return for reducing their cap, he and Team would replace the local level's

resources with technology and in turn help grow the Market Center. However, this was a false promise. Moreover, technology does not replace agent services that the cap paid for. Indeed, the KWRI app did not make KWRI agents better, and on information and belief, hurt agent businesses due to glitches and bugs.[6] Keller therefore convinced franchises to reduce their revenue to benefit himself, promising to deliver technology in return. Meanwhile, Keller kept his revenue and did not lower his Royalty caps.

105.    However, the technology that Keller promised cannot and did not increase an individually owned and operated Market Centers' revenue. Worse, upon information and belief, Defendant Keller pocketed the fees entirely or partially for himself.

106.    Further, when independently owned and operated Market Centers did succumb to Gary Keller and Josh Team's pressure to reduce their caps, thereby demolishing their individual profits, this devalued the Regions where those Market Centers were located as well.

107.    On information and belief, this scheme was created by Keller in an effort to devalue the very businesses that had been previously built up, so that Keller and his team could repurchase the independently owned and operated Market Center and Regions for themselves.

108.    Indeed, when a Market Center or regional owner attempted to sell the inevitably failing and damaged business to an outside individual, Keller time after time stepped into and halted the sale, thereby demanding that the business be sold to him, his partners, or his allies at an even lower price. This was part of Keller's scheme to take back the profits of Market Centers that had grown under Davis's leadership.

---

[6] Keller has even admitted at times that the company was losing its "war on [software] bugs." *See Keller Williams' tech pivot wins over fans, but could face hurdles*, Inman (Aug. 26, 2021), available at https://www.inman.com/2021/08/26/keller-williams-tech-pivot-wins-over-fans-but-could-face-hurdles/.

109.    At no time, however, was it disclosed to franchisees that KWRI would utilize its contractual right to pre-approve any sale in bad faith, leaving Market Centers owners stuck with a business that lost more money with each day.

110.    Through these and other deceptive practices, KWRI encourages and induces potential and existing franchisees to purchase what should be independently owned and operated Regions and Market Centers, before they can become aware of the true lack of profitability resulting from KWRI's fraudulent policies and practices, and the lack of freedom to even sell the franchise once it has proven a failure, or even if the owner faced outside circumstances which caused a need to sell the business, such as an owner passing away. However, owners are not able to freely sell their entity if it is successful or badly damaged—this is Gary Keller's rules, which are built on his whims, on what suits him at the moment. It is not based on a policy, performance, or anything tangible.

111.    Indeed, in a June 7, 2023 Regional Director meeting, Keller told Regional Directors to tell Market Center operators to "lose $200,000 this year in order to make $100,000 the next year, and $200,000 the following year." This statement was not true, and Keller knew, or reasonably should have known its falsity. In that meeting, Keller also threatened Regional leadership, stating that he would take away their interest in the Regions if the Regions did not reach KWRI's unilaterally set goals.

112.    Keller's misleading directives, on information and belief, not only run awry of his *own* business model, but are given for the purpose of further devaluing franchises with the objective of repurchasing them at a deflated price. Indeed, at one point Keller attempted to take KWRI public, as eXp had successfully done, but could not due to KWRI's lack of proper

accounting. Keller could not take KWRI public, so now, on information and belief, he wants to own everything.

113.    Throughout the implementation of their fraud and continuing until the present day, Keller and KWRI have engaged in affirmative conduct and made representations, including those described herein, with the intent and effect of preventing Plaintiff and other franchisees from becoming aware of their rights or otherwise dissuading them from pursuing legal action to vindicate those rights.

114.    The total ramifications of the unlawful conduct is not currently known, and it may take years to uncover the full extent of the harm to be suffered by franchisees due to Defendants' scheme.

## V.      KWRI'S UNCONSCIONABLE FRANCHISE AGREEMENTS

115.    Based upon the misrepresentations stated throughout this Complaint, KWRI exploits its overwhelming bargaining power to require franchisees to sign unconscionably one-sided franchise agreements, without any potential for negotiation of their terms. Most, if not all franchise owners are recruited from within the KWRI ecosystem, have never before owned an independent business, and are financially dependent on the KWRI ecosystem before they become owners of a KWRI franchise.

116.    These misleading and deceptive franchise agreements purport, among other things, (i) to give KWRI and Keller unilateral control over all significant aspects of franchisee operations, even as to items not expressly disclosed such as mandatory purchasing of trainings, Keller's books, events, and other KWRI materials; (ii) to disclaim any responsibility for the effect of KWRI and Keller's decisions and actions on the franchisees' success, profitability, or viability; and (iii) to restrict the ability of franchisees to litigate in their home states and to exercise their

constitutionally-given right to a jury trial, and instead assign franchisees to arbitration and procedural rules designed to hide Keller and KWRI's misconduct.

117.     Further, the franchise agreement gives unconscionable, subjective control to KWRI regarding the sale of a franchise, which KWRI regularly exercises in bad faith. The Franchise Disclosure Document states that KWRI may require that:

> Each transferee has demonstrated to Company's satisfaction that transferee meets Company's subjective and objective criteria for new franchisees , including, but not limited to, Company's educational, managerial and business standards; transferee's experience, education, licensing, good moral character; background and record of compliance with laws and regulations, business reputation, transferee's general aptitude and ability to conduct the business of the Market Center (as may be evidenced by prior related business experience or otherwise); transferee's financial resources and capital for operation of the business; and transferee's geographical proximity to the Market Center.

118.     However, even when those "subjective" conditions are clearly met, Keller and his associates *still* improperly interfere and prohibit the sale of franchises, thereby unfairly restraining free market competition and sales.

119.     Further, incredibly, the Franchise Disclosure Document also states:

> Franchisee and/or each proposed transferee must establish to Company' satisfaction that the terms, conditions and structure of the sale are substantially commensurate with the fair market value for the purchased assets or interests and allow for sufficient cash flow after payment of all ordinary and necessary business expenses, including payment due to Company under this Agreement, to satisfy debt service including without limitation any assumed or existing debt, to satisfy or account for existing or potential liabilities, training costs and transferee's profit expectations; provided that Company's granting of consent to any such transfer does not constitute any representations, warranties or guarantees by Company regarding the terms, conditions and structure of the sale.

120.     Despite requiring that sales must be made at fair market price, Keller and KWRI prohibit and veto independent third-party sales at fair market prices, and instead demand that sale be made to Keller and his associates at a price far below market value.

121.    While the licensing agreements state that a franchisee may sell the region or Market Center to a *qualified* buyer upon KWRI approval (which in reality is Keller's approval), this provision is meaningless, because Keller rarely, if ever approves a sale to a qualified, wholly independent third-party. Instead, according to Keller's playbook, he demands that sale can only be made to himself and his allies, at his dictated price. Keller's "why buy what you can steal" campaign was a constant cycle of devaluing and punishing the individual, devaluing the independently owned and operated franchise, and then taking the franchise as a whole for himself and his affiliates.

122.    On information and belief, Keller uses third parties to build up the location of the franchise, but then seeks to recapture it for himself. Keller runs KWRI as a real-life version of the board game Monopoly, and Keller is always the one that gets to say, "do not pass go."

123.    On information and belief, in furtherance of the illegal scheme, Defendants manipulate the profits of independently owned and operated Regions and Market Centers by saddling them with unconscionable debt prior to the sale in an effort to justify the criminally low price that Keller demands. On information and belief, Keller has also manipulated the profits and losses of the Market Centers that he held ownership in and misrepresent profitability.

124.    The terms of the franchise agreements, included in the licensing agreement, franchise disclosure documents, and KWRI Policies and Guidelines Manual (which KWRI annually updates and uses as an extension of the franchise agreements in order to expand upon the

terms of the original agreement), are, in combination, so burdensome for franchisees and so one-sided in favor of KWRI that they can only be seen as unconscionable and unenforceable.[7]

125.   On information and belief, KWRI is aware, or should be aware, of the unconscionability of its agreements. Indeed, this knowledge is demonstrated by KWRI's proposed shift in its Profit Share agreements with its agents. While for over 30 years, vested agents were able to keep all of their Profit Share when they departed from the KWRI ecosystem, the Profit Share agreements with the agents now state that if a vested agent transfers to a company outside of the KWRI ecosystem, 95% of that agent's Profit Share is kept by KWRI and put into a legal fund to *fight KWRI's own legal battles*. In turn, and true to Keller's playbook, the agent is punished for leaving KWRI.

126.   The net effect on KWRI's franchisees of its approach to franchising is to ensure unconscionably overbroad contracts that purport to circumvent meaningful legal rights belonging to the franchisee, impenetrable systematic barriers to economic success for the franchisees, and negative incentives to pursue legal remedies to redress injuries caused by KWRI and Defendant Keller's conduct.

---

[7] On information and belief, KWRI is aware, or should be aware, of the unconscionability of its agreements. Indeed, this knowledge is demonstrated by KWRI's proposed shift in its Profit Share agreements with its agents. While for over 30 years, vested agents were able to keep all of their Profit Share when they departed from the KWRI ecosystem, the Profit Share agreements with the agents now state that if a vested agent transfers to a company outside of the KWRI ecosystem, 95% of that agent's Profit Share is kept by KWRI and put into a legal fund to fight KWRI's own legal battles. This Profit Share system with agents, who are independent contractors of Market Centers, is problematic in itself to various licensing laws across the country, thereby demonstrating KWRI's lack of regard for both franchising and licensing laws. For example, 19 NYCRR § 175.22 states that "No licensed real estate salesperson may own, either singly or jointly, directly or indirectly, any voting shares of stock in any licensed real estate brokerage corporation with which he is associated." By allowing agents to partake in Profit Share, and therefore have a portion of ownership in the company, KWRI runs afoul of New York State licensing laws. Other states across the country have similar provisions.

## VI.  DEFENDANTS EXPLOIT AND EXTRACT ENORMOUS FEES FROM FRANCHISEES

127.    Once the franchisees are captured into the KWRI fraudulent scheme, KWRI further

traps and defrauds the franchisees by tying the ability to use the KWRI trademark and the ability

to participate in the KWRI system to the purchasing of KWRI branded trainings and other

materials, which are conveniently produced by companies owned and operated by Defendant

Keller.

128.    KWRI franchisees, however, enter into their licensing agreements with limited and

deceptive information regarding the nature of these tying policies.

129.    While neither the licensing agreements nor franchise disclosure documents state

that these Keller-owned products *must* be purchased, upon entering into the agreement, franchisees

are "recommended" to purchase these materials and services, such as MAPS coaching.

130.    If a franchisee chooses not to purchase these materials and services, however, the

franchisee was forcibly pushed out of the KWRI system, by means of removal of his or her

position, and potential non-renewal of their individually owned and operated Market Center.

131.    KWRI requires franchisees to purchase certain goods and services, such as training

for its employees/independent contractors from MAPS, from KWRI-approved vendors, which,

conveniently, are all companies owned by Keller himself and through which, Keller, Team, and

KWRI receive kickbacks from.

132.    In addition to MAPS, these companies also include, but are not limited to, 72Sold,

KWEN, Keller Mortgage and Mutual of Omaha Mortgage, Inc. (which purchased Keller Mortgage

and in which Keller has ownership interests), Keller Title, and KPA.[8] While not disclosed in any

---

[8] In these instances, it is "recommended" that franchisees purchase from these companies directly, of which Keller
receives the revenue as owner of these companies.

of the franchise agreements, if these services are not purchased, negative action will be taken against the owner and/or operator.

133.    Significantly, if Keller owns a company that sells produces or services, franchisees are not permitted in this instance to obtain similar products and services from independent third parties even when the products and/or services of independent third parties are superior and/or less expensive. Indeed, Keller has gone so far as to state from stage at KWRI events that if Keller Williams agents do not promote his company Keller Mortgage, the agents are not honoring their fiduciary duty to their clients.[9] Moreover, on information and belief, the prices charged by Keller for these goods and services are higher than franchisees could obtain from independent third parties in a competitive market. On information and belief, KWRI does this due to Keller's belief that because KWRI is private, they can do what they want "with no penalty."

134.    Notably, however, these products of are no superior quality to those that could be obtained from independent third parties in a competitive market. For example, MAPS "training and education" offers no verified education—it is merely ideas that Keller has thought up on his own or stolen.[10]

135.    Through this scheme, KWRI, Keller, and his affiliates reap substantial revenues and profits that come at the direct expense of its franchisees.

---

[9] Contrary to Keller's assertion, Market Centers and their agents do not have a fiduciary duty to promote Keller's side-hustle businesses.

[10] Indeed, Dianna Kokoszka, who at one point was CEO of MAPS, wanted MAPS to include additional and different thoughts and ideas from different companies and different industries, and therefore had different approaches to real estate than what was originally being taught by Keller through MAPS. Even though Kokoszka was wildly successful and built MAPS into a powerhouse and world-class organization, when she attempted to bring these new ideas to the training and go against what Keller thought up, she was not respected, attacked, threatened, and put in horrible positions for it because, on information and belief, her outside ideas were a threat to Keller's dictatorship over KWRI. On information and belief, Keller wanted to destroy anyone that went against his thinking in any capacity. The people of MAPS are good people who work hard, however, the problem with MAPS now lies with its leadership, specifically Keller's.

136.    This deliberate coercion, carried out using threats and intimidation, creates a hostile environment where franchisees and their invested capital are preyed upon as the most important and most dependable source of revenue and cash flow for the franchisor, with an eye on recapturing a built up business at a much lower price, with little to no concern for the franchisees' positive cash flow generated through the sale of real estate under the KWRI name.

137.    Indeed, Defendants have reaped hundreds of millions of dollars from the "required" purchases of the franchisees from Keller-owned companies. Moreover, once franchisors become aware of this fraudulent scheme—which forces them to purchase overpriced or inferior products or services, and the unconscionable terms of the franchise agreement, including Keller's control over the resale of the entity makes it nearly impossible to exit KWRI with any kind of profit.

138.    Additionally, as stated above, Keller and Team, who collectively form the "technology team" at KWRI, have consistently raised the monthly technology fee to Market Center owners over the years, however, there has been *no demonstrable change or improvement in KWRI's technology*. On information and belief, Keller himself has pocketed the increase in the technology fee—a use of funds that is not designated in the franchise agreements—in order to increase his own bottom line and drive independently owned and operated Market Center profits down even further. Nowhere in any franchise agreement does it disclose or authorize any portion of any fees paid by a Market Center to be used merely to create additional wealth for Keller.

139.    Defendants' practices of knowingly overcharging franchisees and requiring franchisees to only purchase from Keller-owned companies are directly contrary to KWRI's licensing agreements which provide, for example, that "Franchisee and each Franchisee's Principal specifically acknowledge that such training, trade secrets and confidential information is provided by Company *for the benefit of the System, and each Market Center, and that the System and each*

32

*Market Center individually and mutually benefits from all franchises complying with the covenants described below.*" (Emphasis added).

140.    These practices described herein are also contradictory to KWRI's own motto, "where entrepreneurs thrive," as there is little to no opportunity, given Keller's control and operation as a de-facto broker instead of a franchisor, for an owner to make economic decisions for their benefit.

141.    KWRI and its affiliates, including Team and Keller-owned businesses, have received substantial revenues from KWRI's systematic and fraudulent control and overcharging on direct sales to franchisees. For example, on technology fees alone, KWRI's increase of the fee from $25 per month per agent to $51 per month per agent resulted in a $600 million per year profit for KWRI, and the increase alone resulted in a $56 million per year increase, which, on information and belief, all was pocketed by Keller.

142.    Additionally, MAPS coaching alone generates approximately $42 million per year in profit for KWRI. Keller owns multiple other companies from which franchisees are required to purchase, including behavioral profiles, Keller-written books, and other products, including the now defunct KWEN, which directly took Company Dollar from Market Centers and funneled it to KWRI and Gary Keller.

143.    In the KWEN product, Royalty was not enough for Gary Keller. He wanted some of the Market Center's Company Dollar as well.

144.    As a result, KWRI makes hundreds of millions of dollars in profit from the products and services that it forces franchisees to buy *alone*.

## VII.   DEFENDANTS IMPROPERLY SET MARKET CENTER CAPS AND DEVALUE MARKET CENTERS

145.   Upon Davis's departure in January 2019, Keller had free reign to implement his deceptive, narcissistic strategies as he pleased, because, as he had stated before, "because we're private, we're not under a microscope. We can do what we want, any way we want with no penalty."

146.   Immediately after Davis resigned, Keller revamped the KWRI leadership strategy, which, under Davis, focused on empowering each individually owned and operated franchise Market Center to increase profitability, to instead take away all control that investors had in their Market Center and regional franchises.

147.   Notably, in directing that Market Center caps be reduced, Keller *did not reduce the Royalty owed to KWRI*. Therefore, each Market Center had to absorb the full loss of income from the lowered caps, and KWRI and Keller's revenue stayed the same, if not increased. In simplest terms: KWRI and Keller's money went up, and franchisees' money went down.

148.   While this was presented as a "recommendation," presumably to avoid the inevitable legal implications of overtly overstepping his role as a franchisor and instead becoming a de-facto broker, this was far from a recommendation. When dealing with KWRI, like a criminal enterprise, when the "boss" "recommends" a tactic, all better follow suit or face unpleasant consequences.

149.   Indeed, any step outside of Keller's "recommendations," even those not disclosed in the franchise agreements, would result in punishment.[11]

---

[11] For example, after Davis resigned and disagreed with Keller's recommended cap change, without consulting Davis, Defendant Team sent a false email to the investors of the Canada region, which Davis held ownership interest in, stating that Davis would no longer be serving as the Operating Principal of the region. However, Davis had not been removed, and Team's reasons were entirely made up.

150.     Additionally, there were numerous Market Center owners who initially resisted this decrease in Market Center cap. However, these Market Center owners were not given a choice—the only option was to lower caps or be removed from the KWRI system. In this instance, the Market Center owner's investment is taken away, and the franchise is basically stolen out from under them.

151.     Indeed, one Market Center owner, Colleen Basinski (and, on information and belief, hundreds of others), was ordered by the Regional Director[12] to immediately lower Market Center caps or face consequences that included the non-renewal of licensing.[13]

152.     Moreover, adding to the pressure KWRI and Keller were already putting on Market Centers to reduce caps, Keller informed all top agents of the directive to Market Centers to reduce caps, and therefore, if a Market Center did not lower its caps, those agents and any agents that they told could potentially move to a competing Market Center that followed directives to lower caps. In other words, Keller, as KWRI's new CEO, lit a fuse for a civil war amongst Market Centers.

153.     If a Market Center owner refused to lower their caps, Keller, in his own words set out to make that owner "destitute," and, directly and indirectly in violation of the franchise agreements, would solicit top producing agents from that Market Center to move to a complying Market Center that had lowered its caps.

154.     Also, notably, even though Market Center caps were slashed, *KWRI's Royalty fees stayed the same*.

155.     This scheme, according to Keller's directive, entirely devalued individual franchisee profits, while increasing Keller's buying power. Additionally, Keller and KWRI's

---

[12] Regional Directors are part of the Region and are representatives of KWRI.
[13] See *Basinski v. KWRI, et al.*, case no. D-1-GN-23-001314.

representations that induced Market Centers to lower caps were deceptive and false, and only driven by greed. By way of example, and not limitation:

a.   Keller justified the reduction in Market Center caps by stating to owners that reducing caps would drastically increase agent count, as it would have to in order for Market Center owners to break even. When Keller made that representation, he knew agent counts at all Market Centers would not double or drastically increase. In 2018 (January-June), Davis's last year at KWRI as CEO, however, the total agent count at KWRI was 167,254. In 2023 (January-June), after Keller had gone on a four-year personal campaign to lower caps as the CEO and de-facto CEO, the agent count was 169,243. A mere 1% increase in agent count. Net effect: the reduction of the cap had no impact on agent count. Without more agents, individually owned and operated Market Centers inevitably saw their profits disappear.

b.   KWRI is aware that Profit Share is dropping and represents a profit crisis within KWRI. However, this is not because some agents have transitioned to other real estate companies, as KWRI suggests. The Profit Share crisis exists simply because there is less overall profit to share, due to Keller's insistence on Market Centers lowering caps. Keller is attempting to sell people on the idea that the Profit Share system was "broken" while ignoring what is actually causing the issue.

c.   On information and belief, Keller was also upset that the eXp founder did not give back his Profit Share when he left KWRI. Moreover, some of the recently changed internal Profit Share processes and procedures within KWRI include restructuring of the Profit Share program. However, this is futile as more profit is not being created. Instead, KWRI is simply moving money around to create the appearance of profit.

d.   In 2018 (January-June), Davis's last year at KWRI as CEO and before reducing the caps when Market Centers were respected as individually owned and operated businesses, Market Center Owner Profit was in total $105,750,354. In 2023 (January-June), once again after Keller's four-year personal campaign in which he used the forces of his company, Owner Profit was $54,159,041. This is roughly a 50% decrease in Market Center owner profit. The cap does matter for individually owned and operated businesses—it was not Defendant Keller's money to interfere with. Owner profit per individual Market Center also decreased by roughly 50%. In 2018 (January-June), average owner profit per Market Center was $131,367. In 2023 (January-June), it was $65,886.

e.   Notably, Market Centers lost nearly half of their profit under Keller's directive. Despite the drastic reduction in owner profit, KWRI's Royalty *increased*. Indeed, in 2018 (January-June), KWRI Royalties totaled $105,263,219. In 2023 (January-June), KWRI Royalties increased to

$108,633,410. In 2018 (January-June), KWRI Royalties were $105,263,219, and Owner Profit was $105,750,354. When KWRI, collectively, focused on the franchisee with Davis's partnership, the franchisee actually made more money than the franchisor. This was a win-win. Today, in 2023 (January-June), Royalty is $108,633,410 and Owner Profit is $54,159,041. The cap clearly does matter. Focusing on growing franchisees' businesses does matter.

156.     While franchisee profits were cut nearly in half, KWRI and Keller saw their profits and Royalties increase.   Keller and KWRI knew this would happen when they made representations to Market Centers stating otherwise. The net effect of this Keller-mandated, deceptive, fraudulent scheme was that *Keller's purchasing power against the Market Centers and the Regions increased by approximately 60%.* Keller and KWRI misled Market Centers to unknowingly cause their own demise.

157.     In essence, Keller was and is willing to hurt his own people in order to increase his profits—Keller drove profitability down so that he could recapture the individual franchises and own the real estate monopoly by himself and with his allies.

## VIII.   DEFENDANTS INTERFERE WITH THE SALE OF REGIONAL AND MARKET CENTERS AND DEMAND THAT THEY BE SOLD BACK TO KELLER AND HIS AFFILIATES BELOW MARKET VALUE

158.     When Davis resigned as KWRI CEO in January 2019, he had partial ownership in several regional entities, including the Republic of Colorado, Ltd., KW Mid-American Region, Ltd., Region Investco, Ltd., and Anacacho BE, Ltd., Greater Heartland, Southern California, Canada, and Manhattan.

159.     Upon his resignation, and to have a clean break with the KWRI franchise system entirely, Davis set out to sell his ownership interest in the Regions.

160.     Davis had deals set with a third-party, Smokey Garrett, to purchase his ownership interests in the majority of the Regions at fair market value. Keller's actions interfered with both Davis's and Garrett's livelihood.

161.    Garrett was more than qualified as a buyer. Indeed, he was the number one Market Center operator in terms of profit in the system at that time, he was a successful Regional Director he was a Hall of Fame Team Leader, he operated multiple Market Centers at a very high level, he was a driving force behind Keller Mortgage's sporadic successes. Garrett was an excellent teacher as well, and has always been asked by KWRI to teach classes and lead meetings. Despite these clear qualifications, however, Keller refused to let Davis sell his interest to Garrett. Instead Keller used Garrett to get Davis down on price. Then Keller knocked Garrett out of the deal, so that Keller and his associates could benefit. Defendant Keller took what he wanted, consistent with his playbook.

162.    Indeed, Keller, on information and belief, had a playbook of criminal-like behavior to devalue businesses, as demonstrated above, and then re-purchase the business back for himself or for his associates.

163.    Keller's playbook, the "why buy what you can steal" campaign, is clearly evident in Plaintiff's selling of his equity in the Manhattan and Canada Regions upon his resignation from KWRI.

164.    Indeed in 2019, when Davis was about to sell his interest in the Manhattan region, Keller ultimately forced a Market Center within the region to close, and forced another Market Center into default before the sale in order to devalue the region. Keller then told Davis that if he wanted to sell the region, he *must* sell to his associate, Bryan Fair. Keller even gave Fair terms of the sale without consulting Plaintiff. Keller also behind the scenes coached Fair to "blow up" the sale if the terms were not met. Davis, faced with a region that was losing money by the day due to Keller's actions and a strong desire to be done with the KWRI system entirely, had no choice but to sell to who Keller demanded.

165.    As a result, Davis received $500,000 from Fair for the Manhattan Region, a price much lower than it originally was worth before Keller forced Market Centers within the region to close.

166.    Worse, because Keller forced Market Centers within the Region into default, upon receiving the $500,000, Plaintiff had to pay $750,000 to the owners of the Market Centers in order to get them out of default. Beyond that, Plaintiff was forced to pay $225,000 to Keller's associates because, at Keller's coaching, they threatened to "blow the deal up," as well as threatened litigation, if they were not paid. Plaintiff paid these individuals at their demand for the sake of being done with the KWRI system. As a result, the sale of the Manhattan Region, due to Keller's actions, Davis not only did not make money on his equity, it cost him approximately $1,000,000 to get out of business with Keller Williams.

167.    Similarly, with regards to the Canada Region, which Davis in partnering with the Canadian leadership (as he did in the United States), transformed an underperforming Region to one of the top performing Regions in the system, Keller told Davis who he had to sell to and determined how Davis's equity would be split.

168.    When Davis became the Regional Operating Partner of Canada, there were numerous problems across individual Market Centers in the Region due to KWRI's technology. Indeed, the transmittal process in Canada was so cumbersome, it required additional software and steps than that of the US. Further, the app did not work.

169.    When Davis, as Regional Operating Partner of the Canada Region, brought these concerns back to KWRI, he was instructed to set up a Canadian Task Force to remedy these issues. Davis served as the Head of Growth of this Task Force, along with a technology driver, Tami Blakeny, a product driver, Tamara Hurwitz, and a MAPS representative, Dianna Kokoszka. The

Task Force also hired a technologist, Gilles Plourde. With the help of this Task Force, the Canada Region took off and became one of the top Regions in growth.

170.    When Davis went to sell his equity in the Canada Region after his resignation, however, and when Keller deemed the price too high (though it was a price Keller agreed to), Team, working at the direction of Keller, stepped in and destroyed the deal for the sale of the Canada region.

171.    Davis, thinking that he still had some freewill over the sale of his equity, found a qualified, established, third-party buyer that was willing to pay fair market price for the Region.

172.    In response to Davis's potential sale, Keller and Team instructed KWRI to stop funding the Task Force technologist's salary, and to cease providing translation support to the Canada Region, which hurt the agents and the Market Centers in that Region, was essential to the functioning of that Region, and was illegal, as it is the law for Canadian entities to operate with two languages. Further, Team and Keller ceased honoring financial commitments to the Canada Region, thereby jeopardizing the Region's good standing both legally and financially.

173.    Team and Keller did this, on information and belief, all because they wanted to saddle the Canada Region with exorbitant everyday expenses to set up their own translation tools in order to avoid legal consequences resulting from the noncompliance that KWRI had caused, and to drive the price of the Canada region down so that Keller and his associates could purchase the Region.

174.    Keller and Team then told Davis that he was not permitted to sell the Region to a qualified third-party buyer, and if he wanted to sell, he had to sell to a *hand-picked affiliate of Keller*. When this buyer entered the deal, Davis, realizing that if he held onto the Region longer

the price would only be driven down further, was forced to sell the Region for nearly $1,000,000 less than what it was worth.

175.    Indeed, in Keller's own threatening words to Davis, "I believe every day that this region is without new ownership the value deteriorates…if a change…doesn't [happen] pretty soon I have no idea what will exist and what it will be worth."

176.    Keller intentionally created chaos according to his own playbook to get exactly what he wanted. As a result, Davis's ownership interests, and those of hundreds of others, have been devalued by Keller and Team for the purpose of recapturing the entity at a deflated price.

177.    Defendant Keller and his co-defendants engage in an illicit practice of creating issues with regions and regional owners they seek to upend, terminate and take. Keller's co-defendants are repeatedly instructed to "blow up deals" and create situations where regional owners are unable to sell their holdings to qualified buyers and are forced instead to sell their holdings to Keller allies at deflated prices.

178.    Upon information and belief, defendant Keller and his co-defendants have placed the holdings of more than one current Region under threat of default and/or actively sought to take the holdings of others. This activity is often cloaked from the public and those within Keller Williams through arbitration proceedings that shield defendant Keller's illicit schemes from other unwitting market centers and region owners.

179.    As a result of the conduct referred to above, Plaintiff and many other franchisees have lost hundreds of millions of dollars in their investments due to KWRI and Keller's intentional, egregious, deceptive, and greedy practices.

## AS AND FOR A FIRST CAUSE OF ACTION
### Civil RICO in Violation of 18 U.S.C § 1962(c)
### (Against all Defendants)

180.     Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

181.     18 U.S.C. § 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

182.     18 U.S.C. § 1964 provides for civil remedies for violations of 18 U.S.C. § 1962.

183.     18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate" § 1962(c), along with other provisions.

184.     18 U.S.C. § 1961(4) defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  An "association-in-fact" enterprise can be established by demonstrating "(1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit the associates to pursue the enterprise's purpose." *United States v. Hinojosa*, 463 F. App'x 432, 449 (5th Cir. 2012).

185.     Defendants KWRI, Keller, Team, and MAPS have violated 18 U.S.C § 1962(c) because they have conducted or participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity.

186.     The KWRI franchise system, which is comprised of, among others, Defendants KWRI, Keller, Team, and MAPS, and its affiliates and/or subsidiaries that sell products, services and materials to KWRI franchisees, is an association-in-fact enterprise within the meaning of 18

U.S.C. § 1961(4) by virtue of their agency relationships with each other in the area of the KWRI franchise system.

187.    KWRI, as the employer, served as one member of the enterprise as well as provided the structure of the enterprise, with Keller, Team, and MAPS, as KWRI employees and affiliates, serving as the other members of the enterprise.

188.    This enterprise is separate and distinct from the individual defendants that participate in its direct affairs because the structure of the enterprise is imposed by, among other things, the terms of the franchise and licensing agreements upon which defendants have relied upon in requiring Plaintiff and other franchisees to take and/or refrain from taking certain actions throughout the course of dealings within the KWRI franchise system.

189.    The enterprise served to protect KWRI's and the individual defendants' interests, including institutional and financial interests, at the expense of KWRI franchisees such as and including Plaintiff.

190.    Defendants conduct the affairs of the association-in-fact enterprise, as opposed to merely their own affairs, by, among other things, enforcing the provisions of the agreements to require Plaintiff and other franchisees to take and/or refrain from taking certain actions throughout the course of dealings within the KWRI franchise system, by asserting control over the activities of Plaintiff and other franchisees in a hierarchical manner.

191.    Defendant KWRI participated in the conduct of the enterprise through exercising its control, granted to it by means of the franchise agreements, over franchisees' purchasing of products, services, and materials by requiring franchisees to purchase such products, services, and materials, which were produced and sold by companies owned by Defendant Keller, or else be

subjected to removal from their position as owner and/or operator of the Market Center or regional franchise. These purchase requirements were never explicitly set forth in the franchise agreements.

192.    Further, KWRI franchise agreements required franchisees to pay increasing "technology fees," which, on information and belief, were not put towards producing new technology as stated in the agreements. Defendants further gained control over the franchisees by "recommending," but in reality, requiring, franchisees to lower their Market Center caps, thereby devaluing the Market Center, while maintaining or increasing KWRI bottom line, and therefore placing Plaintiff and other franchisees in submissive positions with regard to re-selling their franchises. Indeed, this put KWRI and its associates in positions of control to re-purchase and maintain control over its franchise branches, as franchisees sought to sell their businesses in the face of losing their only cash flow and facing imminent bankruptcy.

193.    Worse, KWRI then exerted control over the sale of these businesses, requiring that they be sold to members of the enterprise and its associates, at a deflated price, much lower than true market value, and lower than the sale price which franchisees could have sold their business for in arm's length transactions to truly independent buyers.

194.    Indeed, the Defendants engage members of the enterprise or affiliated third parties in the resale of KWRI franchises across the country, including Market Centers and regional franchises, at sales prices significantly below the original investment of the franchisee, thereby devaluing the overall market value of a KWRI franchise and making it difficult if not impossible for any franchisees to recoup their investment.

195.    Defendant Keller participated in the conduct of the enterprise through the exercise of his control, as founder of KWRI, over the franchisees' purchase of products, services, and

materials which were supplied by companies that were founded and maintained by Keller, separate and apart from KWRI.

196.    Further, Keller himself was the "mastermind" behind the scheme to have Market Centers lower their caps, as demonstrated through various emails and conversations that Keller engaged in dating back to 2018. This scheme caused both Market Centers and Regions to lose their value so that Keller and his affiliates could repurchase, and maintain control over, KWRI franchises throughout the country.

197.    Keller himself inserted himself in the resale of franchises, such as Plaintiff's regional franchises, refusing to allow Plaintiff to sell to qualified, independent parties at fair market value, and instead demand that in order to be permitted to sell the Regions, they must be sold to Keller and/or his affiliates at a price much lower than market value.

198.    Defendant Team participated in the conduct of the enterprise through scheming to create a "technology plan," to effectuate a higher evaluation for KWRI, whereby inflated technology fees were collected from Market Centers every month, however, KWRI produced no new technology to benefit the franchisees. Further, to the extent that rights to enforce and apply the franchise agreements have been delegated to Team, Team has participated in the conduct of the enterprise through the exercise of his control, over the franchisees' purchase of products, services, and materials.

199.    Defendant MAPS and its affiliates and subsidiaries has participated in the conduct of the enterprise by its provision of products and services to the franchisees.

200.    The predicate crimes committed by Defendants are wire fraud as set forth in 18 U.S.C. § 1343.

201.    Violations of 18 U.S.C. § 1343 are "racketeering" activities as defined in 18 U.S.C. § 1961(1).

202.    The enterprise created a financial benefit to each of the defendants.

203.    In violation of 18 U.S.C. § 1343, Defendants created and effectuated a scheme to defraud Plaintiff and other franchisees, which consisted of deliberately and knowingly causing franchisees to be subjected to exorbitant and burdensome fees in the form of products, services, and materials produced by KWRI, Keller, MAPS and their affiliates, which were not disclosed as requirements in the franchise agreements, and which, if refused, would result in punishment in the form of removal from the franchisees position, ownership, and control over the franchise.

204.    The execution of the scheme to defraud created by Defendants involved numerous individual instances of the use of interstate wire facilities in furtherance of the scheme, which uses of interstate facilities were reasonably foreseeable by Defendants.

205.    The conduct alleged constitutes a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5) as Plaintiff was subject to more than two events of trafficking and exploitation in violation of 18 U.S.C. § 1343.

206.    Specific instances of the uses of interstate wire facilities in furtherance of Defendants' scheme include, but are not limited to: (i) payments made by franchisees for the aforementioned required products, services, and materials, which were wired from individual franchisees to the KWRI headquarters; (ii) franchisees collected the Market Center caps and royalties from Market Center agents, and directly wired the royalties to KWRI headquarters, who then wired part of the royalties to the Regions; and (iii) payments for purchases of franchises at deflated prices were made via wire transfer. Such transfers are ongoing to date.

207.     The acts of wire fraud as alleged herein are related because they involve repeated instances of using interstate wire facilities to defraud the franchisees of money each time a fraudulently required and inflated price is charged to franchisees and received directly by KWRI or in the form of a kickback from other Keller-owned companies, as well as each time a franchise is captured and repurchased by Keller and his affiliates at a deflated price. In addition, all of the KWRI franchises across the country have been victimized by the enterprise's fraudulent scheme, meaning that the scheme has thousands of victims, at minimum.

208.     Plaintiff has been damaged by reason of the Defendants conducting the affairs of the KWRI franchise system though the pattern of racketeering activity as alleged herein, and more specifically have been damaged by the predicate acts of wire fraud that result in payments being debited by electronic transfer from their bank accounts, in amounts to be proven at trial and trebled pursuant to 18 U.S.C. § 1964(c).

**AS AND FOR A SECOND CAUSE OF ACTION**
**Civil RICO in Violation of 18 U.S.C § 1962(b)**
**(Against all Defendants)**

209.     Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

210.     18 U.S.C. § 1962(b) makes it unlawful "to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce" through a pattern of racketeering activity.

211.     18 U.S.C. § 1964 provides for civil remedies for violations of 18 U.S.C. § 1962.

212.     18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate" § 1962(c), along with other provisions.

213.    18 U.S.C. § 1961(4) defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  An "association-in-fact" enterprise can be established by demonstrating "(1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit the associates to pursue the enterprise's purpose." *United States v. Hinojosa*, 463 F. App'x 432, 449 (5th Cir. 2012).

214.    Defendants KWRI, Keller, Team, and MAPS have violated 18 U.S.C § 1962(b) because they have conducted or participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity.

215.    The KWRI franchise system, which is comprised of, among others, Defendants KWRI, Keller, Team, and MAPS, and its affiliates and/or subsidiaries that sell products, services and materials to KWRI franchisees, is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) by virtue of their agency relationships with each other in the area of the KWRI franchise system.

216.    KWRI, as the employer, served as one member of the enterprise as well as provided the structure of the enterprise, with Keller, Team, and MAPS, as KWRI employees and affiliates, serving as the other members of the enterprise.

217.    This enterprise is separate and distinct from the individual defendants that participate in its direct affairs because the structure of the enterprise is imposed by, among other things, the terms of the franchise and licensing agreements upon which defendants have relied upon in requiring Plaintiff and other franchisees to take and/or refrain from taking certain actions throughout the course of dealings within the KWRI franchise system.

218. The enterprise served to protect KWRI's and the individual defendants' interests, including institutional and financial interests, at the expense of KWRI franchisees such as and including Plaintiff.

219. Defendants conduct the affairs of the association-in-fact enterprise, as opposed to merely their own affairs, by, among other things, enforcing the provisions of the agreements to require Plaintiff and other franchisees to take and/or refrain from taking certain actions throughout the course of dealings within the KWRI franchise system, by asserting control over the activities of Plaintiff and other franchisees in a hierarchical manner. Defendants' decisions are based on Keller's own associations with individuals, and not based on true business decisions, such as franchisee profitability.

220. Defendant KWRI participated in the conduct of the enterprise in furtherance of the illegal scheme through inducing the purchase of franchises by franchisees by knowingly misrepresenting facts about the potential revenues and profit margins that franchises could expect to receive, as alleged herein, and then, when the franchises ultimately and inevitably failed, refusing to allow the sale to an individual third-party at fair market price, and instead demanding that it be sold to Keller or his affiliates far below market price.

221. Defendant Keller participated in the conduct of the enterprise in furtherance of the illegal scheme though inducing the purchase of franchises by Plaintiff and other franchisees, by knowingly misrepresenting facts about the potential revenues and profit margins that franchises could expect to receive, as alleged herein, and then, when the franchises ultimately and inevitably failed, refusing to allow the sale to an individual third-party at fair market price, and instead demanding that it be sold to Keller or his affiliates far below market price.

222.    Defendant Team participated in the conduct of the enterprise in furtherance of the illegal scheme by virtue of his position as an officer of KWRI, in which position, on information and belief, he was responsible for the enforcement and endorsement of KWRI policies and practices. Defendant Team also endorsed and assisted Keller's interference in the sale of numerous franchises.

223.    Defendant MAPS has participated in the conduct of the enterprise in furtherance of the illegal scheme by its provisions of services and products to the franchisees.

224.    The predicate crimes committed by Defendants are wire fraud as set forth in 18 U.S.C. § 1343.

225.    In violation of 18 U.S.C. § 1343, Defendants devised and effectuated a scheme to defraud prospective franchisees by knowingly and deliberately making false representations and/or omitted material facts regarding the potential for profit and fair resale to prospective franchisees in order to induce them to purchase and build up a KWRI franchise, then recapture and maintain control over said franchise by requiring that it be sold to Keller and his affiliates at a price lower than fair market value.

226.    The execution of the scheme to defraud by Defendants involved numerous individual instances of the use of interstate wire facilities in furtherance of the scheme, and such uses of interstate wire facilities were reasonably foreseeable by Defendants.

227.    Specific instances of the uses of interstate wire facilities in furtherance of Defendants' scheme include, but are not limited to: (i) payments made by franchisees for the aforementioned required products, services, and materials, which were wired from individual franchisees to the KWRI headquarters; (ii) franchisees collected the Market Center caps and royalties from Market Center agents, and directly wired the royalties to KWRI headquarters, who

then wired part of the royalties to the Regions; and (iii) payments for purchases of franchises at deflated prices were made via wire transfer. Such transfers are ongoing to date.

228.    In furtherance of the illegal scheme, prior to signing franchise agreements, Defendants represented to Plaintiff and other franchisees that running a Market Center or region had the potential to be a profitable business venture and, further, that Market Centers were permitted to set their own caps in light of the market of the pertinent location of the Market Center. However, after signing the franchise agreements, Keller, in 2020, demanded that Market Center caps be significantly lowered, thereby cutting Market Center profits in half. Further, when these businesses inevitably failed, Keller refused to allow owners to sell their businesses to qualified third-party buyers, and instead demanded that such businesses be sold to Keller and/or his affiliates. Such restrictions on the sale of franchises were never disclosed in the franchise agreements.

229.    The predicate acts committed by Defendants as alleged herein constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

230.    The acts of wire fraud as alleged herein are related because they involve repeated instances of using interstate wire facilities to defraud the franchisees of money each time a fraudulently required and inflated price is charged to franchisees and received directly by KWRI or in the form of a kickback from other Keller-owned companies, as well as each time a franchise is captured and repurchased by Keller and his affiliates at a deflated price. In addition, all of the KWRI franchises across the country have been victimized by the enterprise's fraudulent scheme, meaning that the scheme has thousands of victims, at minimum.

231.    Plaintiff has been damaged by reason of the Defendants conducting the affairs of the KWRI franchise system though the pattern of racketeering activity as alleged herein, and more

specifically have been damaged by the predicate acts of wire fraud that result in payments being debited by electronic transfer from their bank accounts, in amounts to be proven at trial and trebled pursuant to 18 U.S.C. § 1964(c).

**AS AND FOR A THIRD CAUSE OF ACTION**
**Violation of § 1 of the Sherman Act**
**(Against all Defendants)**

232.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

233.    There exists a market for ownership in the real estate market franchise, in which KWRI maintains substantial market power. KWRI maintains over 1,100 Market Center offices and approximately 191,000 real estate agents across the United States. KWRI is touted as the largest real estate franchise by agent count in the world.

234.    A separate market exists for related goods and services, including training materials and mortgage providers, associated with the operations of a real estate franchise.

235.    KWRI affiliates, including entities in which it maintains a financial or other ownership interest, as approved vendors of such goods and services from which it receives direct compensation or kickbacks to KWRI or other affiliated entities through Keller's ownership of the related providers.

236.    KWRI conceals the nature of the mandatory purchasing of other Keller-created goods and services from potential franchisees including Plaintiff, in order to lock them into onerous franchise agreements and create excessive control and cost switching.

237.    At all times KWRI and its affiliates had monopoly power, market power and/or economic power in the relevant real estate franchise market, sufficient to force franchisees to purchase and accept the required goods and services from KWRI affiliated companies.

238.    KWRI manipulated its economic power in the real estate franchise market to coerce franchisees to purchase products, services, and good solely from Keller-owned companies, such as MAPS and other affiliated companies in which Keller maintains a financial interest.

239.    Moreover, Keller refused to allow fair sale of Market Center and Regions, and instead demanded that sales be made to himself and his affiliates at a price much lower than fair market value—this is Keller's playbook: "why buy what you can steal." Keller's playbook is done to enrich himself and his associates at the expense of other hard-working, independent owners within the KWRI system.

240.    Through the exercise of KWRI's economic power as alleged herein, KWRI has conditioned the purchase of KWRI franchisees upon the purchasing of goods and services provided by Keller-owned companies from which Defendants receive a kickback, or else be removed as owner and/or operator of the franchise.

241.    Moreover, KWRI has overstepped the legal and ethical bounds of a franchisor and instead has acted as a sole purpose de facto broker, controlling the market, given the sheer size of KWRI.

242.    As a direct and proximate result of Defendants' anti-competitive tying activity, Plaintiff and other franchisees have been injured by being forced to pay inflated prices for goods and services, and have not been allowed to purchase similar goods and services via third-party independent transaction. Further, as a result, Market Centers have been forced to pay much of their expected profit to KWRI in the form of fees, thereby devaluing the Market Center and the Region as a whole.

243.    A substantial amount of interstate commerce in goods and services, including training, is needed to operate a KWRI franchise. KWRI's practices impose an unreasonable

negative effect on competition in the marketplace, because KWRI's policies of coercing and conditioning the purchase and operation of a franchise on the purchase by franchisees of good and services provided by Keller-owned companies, such as MAPS and other Keller-owned entities. This practice forecloses the ability of vendors which are not Keller-owned and operated from selling their products and services to franchisees, even though the quality of such goods and services is equal to, if not better than, the quality of what is being provided by Keller-owned companies.

244.    KWRI's tie of its franchises to products and services from Keller-owned suppliers imposes an unreasonable restraint upon commerce and is therefore per se unlawful and in violation of Section One of the Sherman Act, 15 U. S. C. § 1, and has caused damage to Plaintiff and other franchisees.

245.    Alternatively, even in the event that KWRI's conduct is not per se unlawful, it is unlawful by the rule of reason, in that the anti-competitive consequences of Defendants' conduct outweigh any positive competitive effects.

246.    Based on the foregoing, and due to KWRI's unlawful, anti-competitive conduct, Plaintiff is entitled to damages in an amount to be determined at trial and treble damages, and to permanent injunctive relief prohibiting KWRI's unlawful tying conduct.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Intentional Fraud in the Inducement
### (Against all Defendants)

247.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

248.    As set forth with specificity throughout this Complaint, Defendants knowingly and intentionally made false statements of fact and/or omitted material facts from Plaintiff and other

franchisees. With respect to each such true statement alleged to have been omitted or concealed by the Defendants, the Defendants owed Plaintiff a duty to disclose the truth of such omitted or concealed fact.

249.    The statement and omissions of the Defendants as alleged herein were untrue.

250.    Defendants knew or should have known that their affirmative statements as alleged herein were false, and that their omissions or concealments were deceptive by virtue of being incomplete.

251.    The Defendants made false statements, and engaged in the omissions and concealments, with the intent to defraud Plaintiff and other franchisees in order to induce the Plaintiff and other franchisees to rely on the statements, omissions, and concealments.

252.    Plaintiff and other franchisees believed the false statements made by Defendants, or believed that no facts existed inconsistent with Defendants' omissions and concealments, and acted in reliance upon those beliefs to their detriment.

253.    As a result of his detrimental reliance on Defendants' fraudulent statement and omissions, Plaintiff has been damaged in the future in an amount to be proven at trial.

### AS AND FOR A FIFTH CAUSE OF ACTION
**Breach of Contract**
**(Against Defendant KWRI)**

254.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

255.    The franchise agreements presented to franchisees states, among other things, that "Franchisee and each Franchisee's Principal specifically acknowledge that such training, trade secrets and confidential information is provided by Company for the benefit of the System, and

each Market Center, and that *the System and each Market Center individually and mutually benefits from all franchises complying with the covenants described below*." (Emphasis added).

256.   By KWRI using its control over the suppliers of goods, manipulating the pricing of such goods, failing to disclose the requirement to purchase Keller-owned goods and services in order to maintain a KWRI franchise, demanding that Market Center caps be lowered in order to slash owner profits nearly in half, and then demanding that failing businesses be sold back to Keller and his affiliates at a lower than market value price, KWRI has breached its contractual obligation to make decisions that benefit *both* KWRI and the individual franchisees, thereby devaluing Market Centers and Regions, including Plaintiff's, across the country.

257.   These contracts contain an implied covenant of good faith and fair dealing. They implicitly guaranteed that the parties will act in good faith and deal fairly with each other in the performance of their respective covenants and obligations under the contract and will not take action that will injure the other party or compromise his belief of the contract.

258.   The obligations of KWRI to abide by the implied covenant of good faith and fair dealing is heightened by the substantial imbalance of power between KWRI and franchisees, including Plaintiff, which imbalance allows KWRI to implement the fraudulent scheme described in detail in this Complaint.

259.   KWRI breached the implied covenant of good faith and fair dealing by virtue of the deceptive practices described herein and by acts independent of the deceptive practices. KWRI has denied Plaintiff and other franchisees the ability to achieve their reasonable expectations in entering into the franchise relationship, and has failed to make business decisions for the good of the whole KWRI system, including the franchisees.

260.     As a proximate result of KWRI's breaches alleged herein, Plaintiff has been damaged in amounts to be proven at trial.

## AS AND FOR A SIXTH CAUSE OF ACTION
### General Partner Liability
### (Against Defendant Business MAPS Management, LLC)

261.     Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

262.     At all relevant times, Business MAPS Management, LLC has been the General Partner of Business MAPS, Ltd.  Therefore, pursuant to section 153.152 of the Texas Business Organizations Code, Business MAPS Management, LLC is liable for the indebtedness and conduct of Business MAPS, Ltd., as complained of herein.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff John Davis demands judgment against Defendants KWRI, Keller, Team, and MAPS:

(i)      On the first cause of action for violation of Civil RICO pursuant to 18 U.S.C § 1962(c), a judgment awarding Plaintiff damages in amounts to be proven at trial and trebled pursuant to 18 U.S.C. § 1964(c), plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(ii)     On the second cause of action for violation of Civil RICO pursuant to 18 U.S.C § 1962(b), a judgment awarding Plaintiff damages in amounts to be proven at trial and trebled pursuant to 18 U.S.C. § 1964(c), plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(iii)    On the third cause of action for violation of § 1 of the Sherman Act, a judgment awarding Plaintiff damages in an amount to be determined at trial and treble damages, and to permanent injunctive relief prohibiting KWRI's unlawful tying conduct;

(iv)     On the fourth cause for fraud in the inducement, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements

(v)     On the fourth cause for breach of contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(vi)    Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated:      New York, New York
            August 29, 2023

Respectfully submitted,

**NESENOFF & MILTENBERG, LLP**
***Attorneys for Plaintiff John Davis***

By: /s/ Andrew T. Miltenberg
    ANDREW T. MILTENBERG, Esq. (*pro hac vice application forthcoming*)
    amiltenberg@nmllplaw.com
    KRISTEN MOHR, Esq. (*pro hac vice application forthcoming*)
    kmohr@nmllplaw.com
    **NESENOFF & MILTENBERG, LLP**
    363 Seventh Avenue, Fifth Floor
    New York, New York 10001
    Ph:  (212) 736-4500
    Fax:   (212) 736-2260
    ***Lead Counsel for Plaintiff John Davis***

    JAMES CREWSE, Esq.
    Texas Bar No. 24045722
    jcrewse@crewselawfirm.com
    **CREWSE LAW FIRM, PLLC**
    5919 Vanderbilt Ave.
    Dallas, TX 75206
    Ph: (214) 394-2856
    ***Local Counsel for Plaintiff John Davis***